# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO
_____

UNITED STATES OF AMERICA,

     Plaintiff,

v.                                                18-CR-1572 WJ

LEE ANDREW CLINES,

     Defendant.


## MEMORANDUM OPINION AND ORDER
## DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

THIS MATTER comes before the Court Defendant's Motion to Suppress Evidence, filed October 29, 2018 (**Doc. 31**). Having reviewed the parties' briefs and applicable law as well as the testimony and evidence presented at the hearing, the Court finds that Defendant's motion is not well-taken and, therefore, is denied.

## BACKGROUND

Defendant Clines is charged with possession and distribution of cocaine.  On April 23, 2018, Defendant, who is African-American, was traveling with a female African-American companion on an Amtrak train from California to Newton, Kansas that made a stop at the Amtrak station in Albuquerque.

DEA Special Agent Jarrell Perry ("Agent Perry") is often assigned by the DEA to the transportation stations in downtown Albuquerque, New Mexico to conduct consensual encounters of both Greyhound Bus passengers and Amtrak Train passengers. On April 23, 2018, while the train was stopped at the Albuquerque station, Agent Perry boarded the coach and after obtaining consent, searched Defendant's bag and recovered suspected cocaine from underneath

the soles of a pair of boots. Defendant contends that consent was not voluntarily given because no reasonable person in Mr. Clines' position would have known or believed he had a right to withhold consent, and also claims that Agent Perry unreasonably searched and seized his luggage without probable cause or reasonable suspicion. Defendant moves to suppress all evidence and statements resulting from the search.

## I.    Relevant Facts

Prior to boarding the train car on which Defendant was traveling, Agent Perry had noted from the booking records that two one-way tickets to Newton, Kansas had been purchased separately by the same individual, "K.W." (later identified as Kenya Watkins, Defendant's traveling partner), having the same origination and destination point and using two different phone numbers. The tickets were purchased close to the train's departure time, one ticket purchased for "K.W" and the other for a third party, "Lee Clines." With this information, Agent Perry boarded the Amtrak cars most likely to contain passengers destined for Newton, Kansas and walked through the aisle looking for ticket stubs above the passenger seats showing which passengers were bound for Newton.[1] He found a female passenger destined for Newton sitting along the right side of a car, two seats from the front, who was Ms. Watkins. He also noticed just across the aisle, in the front seat closest to the aisle was a male Newton passenger—the Defendant. After confirming that Defendant and Ms. Watkins were traveling together, Agent Perry began a consensual encounter with Ms. Watkins.

Defendant contends that Agent Perry had "cursory encounters" with other passengers, but that he subjected both Defendant and his companion to extensive questioning about their identities,

---

[1] At the hearing, Agent Perry testified that Amtrak tries to group passengers who are having the same destination together in the same few cars to reduce the disturbance to other passengers who are not disembarking the same time.

places of residence and travel plans, which they provided. Defendant claims that no other passenger received the same "aggressive" treatment. After confirming that Defendant and Ms. Watkins were traveling together, Defendant contends that Agent Perry proceeded to subject them to extensive questioning about their identities, places of residence and travel plans, which they provided. Defendant claims that Agent Perry had "cursory encounters" with other passengers but that his treatment of them was more aggressive.

## II.    Relevant Law

### A.    Seizures Under the Fourth Amendment:

The Fourth Amendment protects "people" against unreasonable searches and seizures conducted by law enforcement officers or other government agents. U.S. Const. amend. IV; *Katz v. United States*, 389 U.S. 347, 351 (1967) (holding that the "Fourth Amendment protects people, not places"). A seizure has not occurred unless a police officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen[.]" *Florida v. Bostick,* 501 U.S. 429, 438 (1991). "[S]o long as the officers do not convey a message that compliance with their requests is required," there is no seizure "when police ask questions of an individual, ask to examine the individual's identification, and request consent to search his or her luggage." Id. at 437. Similarly, unless officers give cause for an individual to believe that he or she may not refuse, no Fourth Amendment interest is implicated by a request to move to another area to speak. *Florida v. Rodriguez*, 469 U.S. 1, 5-6 (1984). "[T]he crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Bostick*, 501 U.S. at 437.

### B.    Consent for Searches Under the Fourth Amendment:

Searches conducted without a warrant are per se unreasonable under the Fourth Amendment, "subject only to a few specifically established and well-delineated exceptions." *Id.* at 357. One such exception to the warrant requirement is that "a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). In order for a search by consent to be valid, the Government has the burden of proving that consent was:

(1) unequivocal, "freely and voluntarily given"; and
(2) without duress or coercion, express or implied.

*Schneckloth* at 222; *United States v. Butler*, 966 F.2d 559, 562 (10th Cir. 1992). Mere submission to lawful authority does not equate to valid consent. *United States v. Manuel*, 992 F.2d 272, 275 (10th Cir. 1993). Courts apply an objective reasonableness test to measure the scope of a person's consent, based on a totality of the circumstances surrounding the search: [W]hat would the typical reasonable person have understood by the exchange between the officer and the suspect? *United States v. Kimoana*, 383 F.3d 1215, 1223 (10th Cir. 2004).

In determining whether the Government has met its burden, the Court must consider the totality of the circumstances. *United States v. Price*, 925 F.2d 1268, 1270 (10th Cir. 1991) (citing *Schneckloth*, 412 U.S. at 227, 232–33, 249)). In considering whether consent was voluntarily given, courts may consider: the age, intelligence, and education of the defendant; (2) the length of [any] detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of [his or] her constitutional rights;[2] and (5) whether the defendant was subjected to physical punishment." *Schneckloth,* 412 U.S. at 226; *U.S. v. Glover,* 104 F.3d 1570, 1580 (10th Cir. 1997).

---

[2] There does not appear to be any *Miranda* issue here, since Defendant does not argue he was either in custody or being interrogated by Agent Perry. *See U.S. v. Perdue,* 8 F.3d 1455, 1463 (10th Cir. 1993) "*Miranda* requires that procedural safeguards be administered to a criminal suspect prior to custodial interrogation") (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)).

The burden of proving that consent to search was given freely and voluntarily is always on the Government on a motion to suppress. *U.S. v. McKneely*, 6 F.3d 1447, 1453 (10th Cir. 1993). The Court may exclude unlawfully seized evidence in criminal prosecutions where a defendant's Fourth Amendment rights has been violated. *United States v. Herrera*, 444 F.3d 1238, 1248 (10th Cir. 2006) (citing *Illinois v. Krull*, 480 U.S. 340, 347 (1987)).

**DISCUSSION**

Defendant raises other arguments concerning Agent Perry's conduct in support of his position that all evidence found as a result of the search should be suppressed, and the Court addresses each one of these in turn. In the end, the Court finds that none of these arguments have any merit at all, In making this determination, the Court relies on: the parties' briefing; Agent Perry's testimony presented at the hearing and the transcript and audio recording of the encounter. Both parties submitted relevant portions of the transcript with the briefs. *See* Doc. 31-2. The audio recording, which is somewhat difficult to hear, was admitted at the hearing as Government Exhibit 1. The Court relies mostly on the transcript version in this discussion because the parties do not dispute the accuracy of the transcript for purposes of this motion.

**I.       "Grilling" and Extensive Questioning"**

Defendant contends that Agent Perry subjected him and Ms. Watkins to aggressive questioning, unlike what other passengers received, suggesting that this occurred because they were the only two African-American passengers on the train. He describes Agent Perry's questioning as "grilling" and "extensive." The Court has reviewed the transcript several times and listened to the eight-minute or so audio recording, and concludes that not even the most thin-skinned individual could regard the questioning as aggressive.

Agent Perry engaged Ms. Watkins first. He asked to see her ticket and questioned her about the trip origin and destination, whether she was having a good trip and whether she was traveling with Defendant. Doc. 31-2. He asked Defendant for his identification; asked him where he lived; how he was doing today (Defendant responded that his "feet [were] just killing" him"); how long he was out in California and the purpose of the visit (a funeral). Agent Perry then asked both of them if they were traveling with luggage and whether they would consent to have it searched. Throughout all of this, Agent Perry's manner and tone is best described as low-key, polite and respectful.

Ms. Watkins consented to have her belongings searched. Defendant responded "Cool" to Agent Perry's request to search his shoes, and "Yeah, go ahead" to his request to search his luggage. Doc. 31-2 at 8-9. When he searched Defendant's backpack, Agent Perry found a large pair of shoes that looked like new work boots because they were "kind of shiny." He looked in the inner sole area, noticing that it was raised and did not look like what a normal sole in a boot would look like. Agent Perry lifted up the inner portion of each sole and noticed a block sock. Inside of each sock was a green saran-wrapped bundle that generally conformed in shape to the bottom of the boot. He testified at the hearing that, based on his experience, he knew that the packaging and concealment method was consistent with illegal narcotics that I had seen numerous times in the past.[3] Agent Perry knew at that point that he had probable cause to arrest Defendant based on that package and bundles found in each boot. *See St. John v. Justman*, 771 F.2d 445, 448 (10th Cir. 1985) (Probable cause requires a "substantial probability that a crime has been committed and that a specific individual committed a crime.").

---

[3] Agent Perry's testimony was in relation to the encounter on the audio played at 4:38.

Defendant's claim that his encounter with Agent Perry was more aggressive than other passengers experienced seems almost flippant. There is no evidence that anyone in Defendant's vicinity on the train were approached by Agent Perry so that Defendant could even begin to fairly claim there was a disparity in encounters. Agent Perry had little recollection of the specifics for that day. He recalled questioning perhaps one other person and noted that if he had not arrested Defendant, he undoubtedly would have attempted to speak with other passengers as well.

Therefore, there is no merit to Defendant's claim that he was subjected to aggressive questioning by Agent Perry.

## II.    Agent Perry's Conduct as "Deceptive" and "Misleading"

Defendant next contends that Agent Perry misled him and Ms. Watkins when he told them that he was checking the train for "security" reasons when in fact he was checking for illegal narcotics. Transcript at 6:1-2; 4-5. This "deceptive" statement fooled Defendant into giving consent to search for weapons and the consent was not to a search for drugs. Defendant also claims it was deceptive for Agent Perry to ask Defendant if he had weapons (to which he responded in the negative), and then subsequently ask if he could search for contraband. This led Defendant to understand that "contraband" meant only weapons, again fooling him into thinking that Agent Perry was searching for weapons and not drugs. Defendant believes that this alleged deception rendered his consent to search involuntary.

### A.    Defendant's Reliance on *Easley*

For support on this argument (and for many of the other issues raised), Defendant relies on *United States v. Easley*, in which United States District Judge Martha A. Vazquez suppressed evidence of drugs found during a Greyhound bus search. Judge Vazquez found that defendant's consent was coerced because Agent Perry had introduced himself as a police officer who was

checking the bus "for security" instead of stating that he was looking for illegal narcotics. The court found that Agent Perry attempted "to assert authority and confuse passengers into believing they could face physical danger if they did not comply with his search requests." 293 F. Supp. 3d 1288, 1304 (D.N.M. 2018). Judge Vazquez also found that defendant's consent was coerced because Ms. Easley, as a black woman, would not have felt free to refuse Agent Perry's request to search, and that the request therefore took on an authoritative and coercive force in the context of a white law enforcement officer speaking to the only black passenger on board.

After briefing was completed on the instant motion to suppress, *Easley* was reversed by the Tenth Circuit. *See United States v. Easley*, 911 F.3d 1074, (10th Cir. 2018). The Tenth Circuit rejected the district court's findings about misrepresentations by Agent Perry, holding that even assuming defendant overheard Agent Perry say he was searching the bus for security purposes, that statement "did not rise to a level of misrepresentation that would create a coercive environment." *Id.* at 1081. The Court of Appeals also rejected the district court's reliance on *U.S. v. Harrison,* where ATF agents obtained consent to enter an apartment by falsely telling the occupant that the agents had received an anonymous tip that there were bombs and drugs inside, leading defendant to believe he was in "physical danger unless he consented to the search. 639 F.3d 1273, 1280 (10th Cir. 2011). 639 F.3d 1273, 1280 (10th Cir. 2011). The court distinguished *Harrison,* noting that "deception about a bomb threat is a difference in kind, not merely degree, from Agent Perry stating that he was searching the bus for 'security purposes,'" and clarifying to multiple passengers that he was specifically looking for contraband." *Easley,* at *4.

At the hearing, defense counsel acknowledged the reversal but argued that it was distinguishable. It is not.

Agent Perry told Ms. Watkins, who was within earshot of Defendant, that he was checking the train "for security reasons." Doc. 31-2 at 6:1-5. He then asked her shortly afterward if she would consent for a search of her bag "for contraband" and asked Ms. Watkins if her luggage had "weapons or anything?" Doc. 31-2 at 7:1-15. Defendant maintains that the instant situation is distinguishable from *Easley* because Agent Perry was "focusing on weapons" by referring to "weapons" specifically. However, Agent Perry referred to "security," "contraband" and "weapons—all within a few minutes of each other, and so the Court fails to see any particular focus Agent Perry was placing on the term "weapons." *Easley* addresses the situation squarely and cannot be set aside or minimized either by factual or legal distinctions, as Defendant suggests.

B.      Consideration of the "Deception" Issue Without *Easley*

The reversal of Judge Vazquez' decision in *Easley* is convenient for the Court's purposes here, but even without the reversal the Court would still have ruled in favor of the Government because this Court was not bound to follow Judge Vazquez' decision. In a recent opinion by United States District Judge Judith C. Herrera, the district court disagreed with Judge Vazquez' conclusion in *Easley* "that a DEA agent improperly attempts to assert authority and confuse passengers when he identifies himself as a police or law enforcement officer who is checking the bus for 'security'":

> In this Court's view, drug interdiction is not an act that is separate and apart from ensuring security on buses, trains, or airplanes. In fact, drug interdiction is very much a part of the broader concept of security on public transportation because the use of public transportation for the conveyance of illegal substances invites various threats, including violence, to the traveling public. **For this reason, it is well known that the Transportation Safety Administration ("TSA"), which is responsible for security in our nation's airports, intercepts illegal narcotics as well as weapons on airplanes as a part of its security measures.** Second, it is not clear to this Court how or why a reasonable person might feel free to decline an encounter with someone who identifies himself as a DEA agent, but yet somehow feel more constrained if they are told the person is a police officer, as *Easley* seems to imply.

No. CR 17-2381 JCH, 2018 WL 770385, at *5 (D.N.M. Feb. 7, 2018) (emphasis added). Judge

Herrera's reasoning not only makes sense, but is consistent with the Tenth Circuit's decision in

*Easley.*

In addition to *Easley,* Defendant also relies on *United States v. Vaughn*, 1:11-cr-01235-

MCA-1, 2013 U.S Dist. LEXIS 201450, slip op. at *20 (D.N.M. Jan. 7, 2013). In that opinion,

United States District Judge Christina Armijo concluded that Agent Perry coerced defendant's

consent because (1) he misled the defendant as to the purpose of his search; (2) it was not clear

whether defendant actually consented to the search because she was on her cell phone during the

interchange with Agent Perry; and (3) defendant was informed she would be patted down before

Agent Perry finished asking whether she would consent to a pat down. *Vaughn* is not factually

analogous because in this case, there were no distractions at the time Agent Perry asked Defendant

for consent and Defendant's belongings were not searched until after Defendant had consented.

Thus, Defendant cannot rely on the district court opinions in either *Easley* (which was reversed)

or in *Vaughn* (distinguishable facts) to argue that Agent Perry misled Defendant and Ms. Watkins

when he told them that he was checking the train for "security" reasons when in fact he was

checking for illegal narcotics, because such conduct was not enough to create a coercive

environment.

## III. Verbal Pressure and Consents by Other Passengers

Defendant claims that consents by others pressured him into consenting to the search of his

own luggage. Agent Perry had announced as he walked through the car that he was "talking to all

the passengers" and when Ms. Watkin asked, "You all search everybody?," Agent Perry

responded, "I've been trying to do as many as I can, ma'am." Ex. 2 at 7:11-18. Defendant

contends that Agent Perry's statements implied that everyone on the train was subject to a

conversation with him and to a search of their bags, and so passengers could not refuse consent—thus making any consent involuntary.

Agent Perry testified at the hearing that he could not recall how many other passengers he had spoken with that day on the train, and that he may have spoken to one or more passengers before speaking with Defendant and Ms. Watkins. He also stated that after arresting Defendant, he could not have spoken with any other passengers. However, even assuming other passengers within earshot consented to be searched by Agent Perry, those consents do not constitute coercion and they do not vitiate any consent given by Defendant. Cooperation by other passengers has no bearing on whether Defendant himself felt free to leave:

> . . . bus passengers answer officers' questions and otherwise cooperate not because of coercion but because the passengers know that their participation enhances their own safety and the safety of those around them." Id. "[T]he fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response.

*United States v. Drayton*, 536 U.S. 194, 205 (2002) (citing *INS v. Delgado*, 466 U.S. 210, 216 (1984) (fact that most passengers cooperate "does not suggest that a reasonable person would not feel free to terminate the bus encounter"). The fact that most citizens will respond to a police request, "and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." *United States v. Esparza-Mendoza*, 386 F.3d 953, 960 (10th Cir. 2004) (a reasonable person should not feel legally compelled to consent to a search, even where a reasonable person might feel compelled by "simple good manners" or by an "understandable but nonetheless unnecessary unease around law enforcement officers); *see also United States v. Roberson*, 864 F.3d 1118, 1133 (10th Cir. 2017) (Hartz, J., concurring) (fact that "almost any innocent person . . . would feel like complying" does not mean that police conduct has conveyed compulsion); *U.S. v. Salazar,* 609 F.3d 1059, 1064 (10th Cir. 2010) (coercive

environment refers to an environment that is the creation of law enforcement conduct). Therefore, consents given by other passengers do not affect the voluntariness of Defendant's consent.

## IV.    Right to Refuse Consent

Defendant contends that he was not provided any information suggesting that he was free to decline the search, which in turn suggests that Defendant has a constitutional right to be given this information.  This is not so. It is well established that "knowledge of the right to refuse consent" is not "a necessary prerequisite to demonstrating a 'voluntary' consent." *United States v. Thompson*, 524 F.3d 1126, 1134 (10th Cir. 2008); (*Schneckloth v. Bustamonte,* 412 U.S. at 232-33).  It is, instead, only one factor considered in the totality of circumstances.

As the Government points out, an advisement of rights from Agent Perry would certainly have dispelled any claim of coercion, but the lack of such advisement cannot create an inference of coercion.  There must be other facts, based on a totality of circumstances, from which one can infer coercion or duress. *See, e.g., Bumper v. North Carolina,* 391 U.S. 543, 550 (1968) ("When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search.").  However, from the transcript of the search, Agent Perry's requests for permission to search appear to be polite and devoid of any coercion or insistence and he did not keep any of Defendant's personal effects, such as his ticket or ID.[4] Therefore, the fact that Defendant was not affirmatively told he had the right to decline the search, without more, does not violate the Fourth Amendment.

## V.    Whether Encounter was Consensual

---

[4] The audio recording, which is somewhat difficult to hear, was admitted at the hearing as Government Exhibit 1. Parties do not dispute the accuracy of the transcript for purposes of this motion and both sides have attached relevant transcript portions to their pleadings.

Defendant claims that Agent Perry's physical presence and location effectively left him no choice but to consent to the search because he was not free to leave the train car, and therefore his consent was coerced:

> Agent Perry then approached Ms. Watkins and Mr. Clines. He stood in the aisle, blocking their ability to exit the cramped confines of their passenger seats in the coach section. Agent Perry stood over Ms. Watkins and Mr. Clines . . .

Doc. 31 at 3. Defendant suggests that because Agent Perry physically blocked any egress from the train car, he was not in a reasonable position to refuse consent to answer Agent Perry's questions or to decline the search. The physical location of the search is one of the factors considered in a totality of circumstances approach. *See Fla. v. Bostick*, 501 U.S. 429, 439 (1991) ("cramped confines of a bus are one relevant factor that should be considered in evaluating whether a passenger's consent is voluntary" but noting that this single factor will not be dispositive in every case because a court "must consider all the circumstances surrounding the encounter. . . .").

Defendant's arguments fail on this issue. After listening to the testimony at the hearing, the Court is convinced that Agent Perry was not physically posing any kind of restriction to Defendant's freedom of movement. There were three exits on the train car: forward, back and in the middle. Agent Perry was standing *behind* Defendant's seat and the forward train exit was directly in front of Defendant, allowing Defendant the ability to leave the vicinity of the train car whenever he wanted. In fact, Agent Perry recollected that at one point during the encounter, Defendant himself stood up and blocked the aisle for other passengers trying to walk by where Defendant was standing.

Next, Defendant contends that Agent Perry made him *feel* as though he could not leave and was therefore compelled to answer Agent Perry's questions, However, the facts in this case support a finding that a reasonable person would not feel that Agent Perry's conduct was coercive:

- Agent Perry was in plain clothes and no weapons were displayed or brandished;

- His requests to the passengers was polite and respectful (from the transcript of the search);

- Agent Perry approached the passengers individually to request permission to search; and

- He used no violence or threats of violence; nor did he make any promises or inducements of any kind.

The situation here is factually comparable to *United States v. Drayton,* where the Supreme Court found that ample grounds existed to conclude that a bus interdiction encounter was cooperative and not coercive or confrontational. 536 U.S. 194, 195 (2002). The facts in that case showed that there no overwhelming show or application of force; no intimidating movement, no display of weapons, no blocking of exits, no threat, and no command, not even an authoritative tone of voice. The Supreme Court specifically noted that "[h]ad this encounter occurred on the street, it doubtless would be constitutional. The fact that an encounter takes place on a bus does not on its own transform standard police questioning into an illegal seizure." *Id.*

Last, any constriction Defendant may have felt because the encounter took place in a train car cannot be blamed on Agent Perry's presence. *See Florida v. Bostick*, 501 U.S. at 436 (defendant's movements were confined as a result of his decision to take the bus, and he "would not have felt free to leave the bus even if the police had not been present"); *U.S. v. Broomfield*, 201 F.3d 1270, 1275 ( 10th Cir. 2000 (noting that freedom of movement was the "natural result" of defendant's "choice of transportation and seat assignment" and not a result of the agent's conduct); *see also U.S. v. Vaughn*, No. 1:11-CR-01235-MCA-1, 2013 WL 12333588, at *10 (D.N.M. Jan. 7, 2013) (agents' position standing over defendant—standing over her and blocking her egress "was not the product of the officer's conduct; it was simply the result of the fact that the interaction occurred on a train car").

In addition, the fact that the encounter between Defendant and Agent Perry took place in a public setting weighs against Defendant's claim that his consent was involuntarily because a person "is more likely, not less, to refuse an officer's request when in a public setting such as a train car." *U.S. v. Zapata*, 997 F.2d 751, 757 (10th Cir. 1993); *see also U.S. v. Ward*, 961 F.2d 1526, 1532 (10th Cir. 1992) (in a public setting," particularly where a questioned person can see that other persons also are being questioned, the reasonable innocent person is less likely to feel singled out as the officers' specific target—and less likely to feel unable to decline the officers' requests and terminate the encounter"); *U.S. v. Drayton*, 536 U.S. 194, 195 (2002) ("because many fellow passengers are present to witness officers' conduct, a reasonable person may feel even more secure in deciding not to cooperate on a bus than in other circumstances); *Bostick,* 501 U.S. at 435-36 ("But when the person is seated on a bus and has no desire to leave, the degree to which a reasonable person would feel that he or she could leave is not an accurate measure of the coercive effect of the encounter").

Therefore, the setting of the interchange here—inside an Amtrak train car—would not cause a reasonable person to feel that he was not at liberty "to ignore police presence and go about his business." *Bostick*, 501 U.S. at 437. Feelings of restriction were a natural consequence of riding in a train car, but the Fourth Amendment extends only to governmental actions that unreasonably restrict an individual's movements—it has no application to Amtrak's decisions regarding the size of its train cars.

Consent is involuntary when a government agent implies that compliance with their request is *required* or when deceit or trickery is used to imply that an individual has no ability to refuse consent. *Harrison,* 639 F.3d at 1280 ("a ruse or officers' undercover activity does not usually violate individuals' rights" unless the effect of the ruse "is to convince the resident that he or she

has no choice but to invite the undercover officer in").  Here, Agent Perry asked to search Defendant's luggage and then his shoes.  Defendant responded "Yeah, go ahead" to the request to search his luggage and then "Cool" to the request to search his shoes.  Doc. 31-2 at 8-9.  Defendant does not claim that his age, intelligence or education prevented him from knowingly consent to the search, and a typical reasonable person would understand this exchange to exhibit a knowing consent to the search, without equivocation or uncertainty.  A typical reasonable person would also understand the exchange, in light of all the facts, to indicate a consent that was freely given without duress or coercion.  There is no evidence of a show of force or threats of force used by Agent Perry.  He boarded the train car alone and in plainclothes without any weapons in view. The encounter was relatively quick and brief, and Agent Perry did not waste time asking questions regarding Defendant's travel plan and obtaining consent; even the small talk was kept to a minimum.   No deceit or trickery was used; Agent Perry stated he was conducting security searches and looking for contraband instead of telling Defendant he was searching for illegal drugs and a typical reasonable person would not consider the statement as one that took away their choice to refuse.  Arguably, a person hauling drugs on an Amtrak train is *not* the "typical reasonable person" – but that is not the viewpoint that is used in the analysis. Considering all of the evidence and testimony, the Court finds no basis at all for Defendant's claim that his consent was coerced and not knowing or voluntary either because of the physical location of the encounter or Agent Perry's physical presence.

## VI.    Financial Pressure

Defendant included this argument in his brief although he did not address it at the hearing. Defendant claims that his consent was not voluntary because he was forced to travel by train because of his meager financial resources.  Those same meager financial resources prevented him

from leaving the train to avoid contact with Agent Perry because he could not afford to buy another train ticket, nor could he afford the gas money to drive.

Not surprisingly, the Government offered no response to this argument, nor is any response necessary. Any difficulties Defendant faces financially are not caused by the conduct of Agent Perry or any government agent and so Defendant's financial condition is irrelevant in a Fourth Amendment inquiry.

## VII.    Racial Considerations

### A.    Targeting Defendant

At the hearing, Agent Perry explained his process for targeting specific travelers on an Amtrak train or Greyhound bus, starting with examining the passenger name record ("PNR") which contains information on characteristics of the purchases, such as: (1) whether cash or credit was used for the purchase; (2) whether ticket is one-way or round-trip; and (3) whether the purchase was a third-party credit card purchase. The PNR contains no indication at all concerning a passenger's race and so it was not possible to know the races of the passengers making the stop in Albuquerque that day.

Agent Perry noted that Ms. Watkins purchased two tickets separately, instead of purchasing two tickets in one transaction which would have saved time. The tickets used two different phone numbers and were purchased an hour apart by the same person with the same origination and destination points. Seat assignments were based on destination but were not given until the passengers actually boarded. These ticket stubs, which showed the destination, were placed above each passenger seat, and Agent Perry relied on these in targeting specific individuals for encounters. In this case, Agent Perry was interested in the passengers going to Newton, Kansas and knew there would not be many passengers going to that destination.

Thus, it is very clear that race was not a factor in narrowing down which passengers to look for because that information was simply not available from the PNR. Agent Perry could not know Defendant's race until he found the Newton, Kansas ticket stub above the seats of Defendant and Ms. Watkins. Agent Perry could not have targeted Ms. Watkins and her companion (the Defendant) based on their race, because when he decided to target them he had no information on their race at all. He did, however, have sufficient reasonable suspicion to check the Newton-bound ticket stubs. Defendant argues that it is not illegal to purchase two one-way tickets in separate transactions, and this is true. Likewise, it is not illegal for Agent Perry to use his knowledge and experience to narrow down passengers he chose to question in conducting his drug interdiction activities. Defendant was not arrested because of the way his train ticket was purchased. He was arrested because he consented to a search which revealed illegal drugs stashed away in the soles of his shoes.

B.    Seizure Inquiry

Defendant contends that the voluntariness of his consent to search must be considered in light of his perception as an African-American, of his interaction with a white officer like Agent Perry. He argues that race was a factor in the legality of the search and that "a reasonable African American man would have felt seized by Agent Perry early on in their encounter." Doc. 31 at 14.

Defendant relied on the district court opinion in *Easley* in the briefing on this issue, which holds no weight at all now after reversal by the Tenth Circuit Court of Appeals. The Tenth Circuit soundly rejected the consideration of a person's race in a "reasonable person" seizure analysis, noting that that test is an objective one which considers "not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would

have conveyed that to a reasonable person." *Easley,* 911 F.3d at 1082 (citing *United States v. Mendenhall*, 446 U.S. 544 (1980)):

> Requiring officers to determine how an individual's race affects her reaction to a police request would seriously complicate Fourth Amendment seizure law. As the government notes, there is no easily discernable principle to guide consideration of race in the reasonable person analysis. . . . There is no uniform life experience for persons of color, and there are surely divergent attitudes toward law enforcement officers among members of the population. Thus, there is no uniform way to apply a reasonable person test that adequately accounts for racial differences consistent with an objective standard for Fourth Amendment seizures. . . in short, the categorical consideration of race in the reasonable person analysis is error, and we reject Ms. Easley's argument to the contrary.

*Easley*, 911 F.3d at 1082. Defendant cannot inject his race or his subjective perceptions as an African-American individual in the analysis because the Fourth Amendment standard requires viewing Agent Perry's conduct in light of a reasonable person, not "a reasonable African American man." The Court of Appeals added in a footnote that particular personal traits of a defendant are irrelevant to the Fourth Amendment's reasonable person test "other than to the extent that they may have been known to the officer and influenced *his conduct*." *Id.* at *5, n.3 (citing *U.S. v. Little,* 18 F.3d 1499, 1505 (10th Cir. 1994) (en banc) (emphasis in original).[5] In this case, Agent Perry's conduct could not have been influenced by Defendant's race because the PNR, which Agent Perry used for selecting certain travelers for possible questioning, contained no information about any passenger's race. There is also no evidence which would lead a reasonable person to believe that his freedom of movement was restricted by law enforcement, based on Agent Perry's physical appearance, language and tone during the encounter.

---

[5] The Tenth Circuit explained that such characteristics would also be relevant in a seizure analysis where such conduct takes the form of differentiating on the basis of raise, which raises "serious equal protection concerns if it could result in different treatment for those who are otherwise similarly situated." *Easley*, 2018 WL 6787561, at *5. Id. Here, though, Defendant does not come close to asserting any kind of equal protection or selective enforcement claim on the basis of race where Agent Perry subjected him to treatment different from other passengers. In fact, the Government points out that Agent Perry did not conduct consensual encounters with other passengers in Defendant's immediate area, so there would not be much opportunity to make much comparison with other passengers. See Doc. 42 at 6, n.1 (noting requirements for assertion of such claims).

B. <u>Voluntariness of Consent</u>

The essence of voluntariness is whether the Government obtained the statements by physical or psychological coercion such that Defendant's will was overcome. *See Miller v. Fenton*, 474 U.S. 104, 116-117 (1985). Defendant claims that his race as African-American should be factored into the voluntariness of his consent, and that Agent Perry's interactions were coercive because he is African-American. There are several problems with this argument.

First, if Defendant's race is considered at all, it is but one factor to consider under a totality approach. *See United States v. Mendenhall*, 446 U.S. 544, 558, 100 S. Ct. 1870, 1879, 64 L. Ed. 2d 497 (1980) (finding "not irrelevant" that black, uneducated defendant may have felt unusually threatened by white male officers, but noting that such factors were not decisive and concluding that defendant voluntarily consented to accompany officers under a totality of evidence). Defendant contends that the analysis should be carried out against a historical "backdrop of fear between people of color and law enforcement," again relying on the district court's reasoning in *Easley,* but this reasoning has now been rejected by the Tenth Circuit. Also, as the Government points out, Defendant's unease with law enforcement may be the result of his lengthy criminal history and familiarity with the criminal justice system.

Second, courts apply an objective reasonableness test to measure the scope of a person's consent, based on a totality of the circumstances surrounding the search. *Kimoana,* 383 F.3d at 1223. As mentioned, Defendant's statements "Cool" and "Yeah, go ahead" were specific and unequivocal responses to Agent Perry's specific requests. There was no evidence of force of threat of force; Agent Perry boarded the train himself, in plain clothes and no weapons in view. The interchange between Defendant and Agent Perry was even-tempered and polite. Given the facts underlying the encounter, with no evidence of a show of force, the nature and scope of questions

asked, the tone of the exchange and duration of the encounter, a reasonable person would understand Defendant's responses to be unequivocal and voluntarily consent. These circumstances are very close to the situation in *United States v. Soto*, where the Tenth Circuit affirmed the district court's ruling that consent was voluntary:

> [T]here is no evidence that any overt coercion was employed. It appears Barney did not unholster his weapon, did not use an insisting tone or manner, did not physically harass defendant, and no other officers were present. Further, the incident occurred on the shoulder of an interstate highway, in public view. Officer Barney sought permission specifically to look in the trunk, and defendant got out of the car and opened the trunk himself. Defendant makes no contention that he misunderstood Barney's request; any such claim is precluded by defendant's act of opening the trunk. Thus, defendant's consent was unequivocal and specific.

*Soto*, 988 F.2d 1548, 1558 (10th Cir. 1993). Therefore, the Court rejects Defendant's argument that his race had any influence on his consent to be searched.

## CONCLUSION

In sum, based on counsel's arguments as well as the evidence and testimony presented at the hearing, the Court finds and concludes that Defendant's consent was voluntary and knowing, and Agent Perry's search of Defendant's belongings did not violate the Fourth Amendment.

**THEREFORE,**

**IT IS ORDERED** that Defendant's Motion to Suppress Evidence (**Doc. 31**) is hereby DENIED for reasons described in this Memorandum Opinion and Order.

_____
CHIEF UNITED STATES DISTRICT JUDGE